UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| EXPRESS LIEN, INC. dba ZLIEN | * * * | CIVIL ACTION NO.: 2:16-cv-02926 |
| VERSUS | * * | JUDGE:  CARL BARBIER |
| NATIONWIDE NOTICE, INC. | * * | MAGISTRATE:  KAREN WELLS ROBY |
| AND | * * | |
| ABC INSURANCE COMPANY | * * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

**NATIONWIDE NOTICE, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF PURPORTED PLAINTIFF'S EXPERT JASON MARSH**

Defendant Nationwide Notice, Inc. ("Nationwide") respectfully submits this Memorandum in Support of its Motion to Exclude Testimony of Jason Marsh, the proffered expert of Plaintiff, Express Lien, Inc., d/b/a Zlien ("Zlien").  Not only does Marsh lack the requisite professional and academic experience to testify as an expert under Federal Rule of Evidence 702, but he did not employ any methodology at all, and his conclusions are merely his own unsupported and speculative opinions.  Marsh made no effort to independently investigate or evaluate *any* of the facts underpinning his conclusions, and instead, relied exclusively upon untested assumptions provided to him by Zlien and its counsel.  Accordingly, the Court should grant Nationwide's motion and preclude Mr. Marsh from testifying in this matter.

**BACKGROUND AND MARSH'S OPINION**

Zlien and Nationwide are business competitors that provide web platforms that allow users to prepare and file lien and notice documents for construction projects. (Rec. Doc. 32, ¶¶ 8, 21).  Zlien initiated this suit claiming it discovered certain alleged copyrighted material being displayed on Nationwide's website. (Rec. Doc. 32, ¶ 18).  In addition to asserting a claim

under the Copyright Act, Zlien lodges causes of action against Nationwide for trade dress infringement, breach of contract, and violation of Louisiana's Unfair Trade Practices Act ("LUTPA").

Zlien offers Jason Marsh ("Marsh") as an expert to opine on the impact of alleged "content scraping" committed by Nationwide. Marsh defines "scraping" as the "act of taking original content from a legitimate website and using that content on another website without the knowledge or permission of the content's owner, and then passing off that content as their own." (Ex. A, Marsh Report, p. 2). Marsh's report contains the following opinions:

- "*To the extent that* Nationwide Notice, Inc. scraped Zlien's content, they [sic] *would have* deceived website visitors by artificially presenting themselves as an industry authority[.]"

- "By presenting Zlien's industry expertise and business assets as their [sic] own, Nationwide Notice, Inc.'s deception *would have* come at the expensive [sic] of Zlien. Artificially presenting industry expertise and misleading prospective customers in the mechanics lien industry, [sic] Nationwide Notice, Inc. unfairly shifted the competitive environment in a way that *would have* adversely impacted the sales and marketing efforts of Zlien[.]"

- "Additionally, Nationwide Notice, Inc.'s misleading marketing efforts *would have* diverted brand recognition, undermined market differentiation and taken market share and revenue from Zlien … as well as making the sales process more challenging (and costly)[.]"

- "In scraping Zlien's content for their own benefit, Nationwide Notice, Inc.['s] actions have adversely impacted Zlien's position in the market with a segment of the overall target audience in the industry."

- Marsh concludes by "provid[ing] a simple calculation by which we might estimate the financial impact to Zlien by Nationwide Notice, Inc.['s] use of their [sic] content."

(Ex. A, p. 4) (emphasis added).

Marsh's deposition revealed that his opinions regarding the impact of the alleged content scraping—what his report repeatedly states "would have" happened "if" content were scraped—are entirely speculative; he did not evaluate the actual impact of the alleged copying. Instead, Marsh merely opines that *if* content were scraped, *if* Nationwide presented the content as

its own, and *if* Nationwide used the content to build brand authority, *then* Zlien *could be* adversely impacted. Marsh offers no opinion on what *actually* happened, or whether there *actually was any harm*:

> Q: You didn't actually analyze independently whether one company took another company's content?
>
> A: Right. That was the overarching assumption. Other than one simple screen shot, I didn't have a ton of specific evidence or facts that would suggest that happen[ed]. So I wrote the opinion to say, if this did happen, this is my opinion on why that can be harmful to Zlien and why that would be something inappropriate for Nationwide to do.
>
> Q: But you didn't analyze whether … that was harmful. Your opinion is, if this happened, if this infringement happened, it could be harmful in the following ways?
>
> A: Yes. **I wasn't asked to do an analysis, I was asked to write an opinion**.
>
> Q: Right. That's what I'm trying to figure out. **Your opinion is,** *if* **this infringement happened, it** *could be harmful* **in the following ways, correct?**
>
> A: **Yeah**.
>
> Q: But as we talked already about – **you didn't analyze whether it was** *actually harmful* **and** *how harmful* **it was; is that right?**
>
> A: **No, I had no way to do that.**

(Ex. B, at 63:1-64:1) (emphasis added). Although Marsh agreed that it was important to his analysis, Marsh conceded he did "not know what exactly the content [was] that was taken," and he did not have information regarding how long the content was posted on Nationwide's website, how many people saw the content, whether Zlien lost any revenue, or whether Nationwide gained any revenue. (Ex. B, at 49:19-23; 50:1-24). Further, Marsh readily confessed he did not examine whether Nationwide actually took the content, whether Zlien lost any market share, whether Nationwide acquired any customers as a result of the alleged scraped content, or

- 3 -

whether Nationwide "diverted brand recognition from Zlien." (Ex. B, at 62:22-63:3; 65:15-24; 67:8-19; 68:10-10). Neither did Marsh analyze any information regarding Zlien's customers or sales. (Ex. B, at 65:10-14). Marsh even admitted he "knew the amount of information [he] had available to [him] was incomplete." (Ex. B, at 51:3-8).[1] Simply put, there are no facts, analysis or methodology underlying Marsh's opinions—they are simply subjective beliefs based on hypotheticals supplied by Zlien's counsel. Such "methodology" is untestable, unreliable, unscientific, and flies in the face of the *Daubert* standard.

Regarding Marsh's back-of-the-envelope calculation of purported damages, this opinion is neither helpful to the trier to the fact nor derived from any scientific methodology. Marsh is neither a CPA nor an economist, and despite that he has no financial experience or education (Ex. B, at 61:12-25; Ex. A, p. 16), Marsh's report declares that **Zlien** "stated it has taken an estimated 4,128.44 hours to create and compile the informational content and resources presented across its website properties," and that, based on a rate of $150/hour, it is Marsh's opinion that the 4,128.44 hours of content "would equal a content value of $619,266." (Ex. A, at p. 15). However, Marsh admits this "content value" is based on *all of the content on Zlien's*

---

[1] It is expected that Zlien will attempt to defend Marsh's lack of investigation by claiming that he was denied access to certain information in discovery prior to the deadline for submission of his report. Zlien's argument is a red herring and disingenuous. While the parties had certain discovery disputes—which is expected in a lawsuit between competitors involving highly sensitive, confidential and proprietary information—the parties consistently cooperated to resolve those issues fairly, efficiently, and in accordance with the Federal Rules of Civil Procedure. To the extent Zlien may argue it was denied access to information necessary for Marsh's report, Zlien was fully aware of the discovery and expert deadlines, and at no point did Zlien ever seek court intervention for any discovery issues. What's more, at no time after Zlien submitted Marsh's report did Zlien ever amend the report, or request that Marsh update his analysis—Marsh testified that Zlien did not send him any additional documents after submission of his report. (Ex. B, at 55:19-57:19). Lastly, the documents Marsh failed to examine are those documents in Zlien's possession—its own revenue, market share, customer, and sales documents—and therefore any claim that Nationwide is responsible for the inadequacy of Marsh's investigation falls flat.

*website* – not just the portion alleged to be infringing. (Ex. B, at 48:20-25). And he could not say whether the "content value" constitutes Zlien's damages: he concedes he is not a damages expert, and that he did not do any damages analysis. (Ex. B, 48:8-13; 51:3-12; 60:7-22; 61:7-11). Marsh also concedes Zlien's CEO, Scott Wolfe, provided the formula for computing "content value," and that it is not a "generally accepted methodology." (Ex. B, 47:16-24). Marsh did not analyze any financials, and he did nothing to investigate the 4,128.44 hour figure Zlien's counsel provided. (Ex. B, 64:17-65:3). Indeed, Marsh testified he did not provide any damage analysis in this case because "he didn't really have very much information on how much content was taken," "how many people had seen that content," or "how much revenue was generated during that period of time that content was being utilized." (Ex. B, at 46:22-47:8). Moreover, Marsh offers no opinion on whether a copyright or trade dress violation occurred in this case: he admitted he is not a copyright or trade dress expert, that he does not know what "trade dress means," and that he did not analyze whether any infringement occurred. (Ex. B, at 53:3-23; 60:15-17). As a result, it is unclear how Marsh's hypothetical and speculative opinions based exclusively upon assumptions Zlien's counsel supplied could be helpful to the trier of fact; if Marsh admits he is not a damage, trade dress, or copyright expert, his opinion is irrelevant and would be useless to the trier of fact.

Marsh's concessions regarding the scope of his own report, as well as his admissions regarding the glaring absence of any analysis, investigation, information, or methodology supporting his opinions, do not leave anything upon which to opine, and his testimony will do nothing to assist the trier of fact. The Court should preclude Marsh from testifying at trial.

## **LEGAL STANDARD**

Under Federal Rule of Evidence 702 and the *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), line of cases, the trial judge performs a gate-keeping role to ensure expert testimony is both reliable and relevant. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). Under *Daubert*, the trial court must strive to ensure "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. The testimony must be supported by "more than subjective belief or unsupported speculation." *Paz v. Brush Engineered Materials, Inc.,* 555 F.3d 383, 388 (5th Cir. 2009). While the Court should focus solely on the proposed expert's "principles and methodology, not on the conclusions that they generate," *Daubert,* 509 U.S. at 595, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

An opinion premised on insufficient and erroneous information is not reliable. *Paz*, 555 F.3d at 389. Reliability requires more than subjective belief or unsupported speculation. *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1234 (5th Cir. 1986)); *accord Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996). Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony must "be derived by the scientific method" and "supported by appropriate validation—*i.e*., 'good grounds,' based on what is known." *Daubert,* 509 U.S. at 590, 592-93. The *Daubert* reliability analysis applies, among other things, to "the facts underlying the expert's opinion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).

As the sponsor of the evidence, Zlien bears the burden of establishing the admissibility of its expert scientific evidence "by a preponderance of proof." *Daubert*, 509 U.S. at 592 & n.10. The onus includes the "burden of showing 'that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology'; 'the expert's bald assurance of validity is not enough.'" *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995)).

## LAW AND ARGUMENT

### I. Marsh Is Unqualified To Offer An Opinion On The Impact Of The Alleged Content Scraping.

Marsh fails the first prong of Rule 702: he is not "qualified to testify competently regarding the matters he intends to address." Fed. R. Evid. 702. He has absolutely no academic background in marketing or advertising. (Ex. A, p. 16). After graduating college with a political science degree, Marsh spent three years traveling in Australia and another three years working in the service industry until he got an internship with an advertising agency in 2003 or 2004. (Ex. B, at 20:1-21:16). Since that time, his professional experience is limited to "marketing strategies and promotional campaigns that are designed to drive ***new client and patient acquisition*** efforts[.]" (Ex. A, at p. 2). However, Marsh has no experience related to the impact of content scraping, loss of market share, or the mechanics lien industry. (Ex. A, at p. 16). His only other experience as a proffered expert witness was in a different case filed by Zlien against a different competitor for alleged intellectual property infringement of similar content, but he has never been admitted to testify as an expert. (Ex. B, at 31; 41). What's more, Marsh has never authored any publications about "content scraping" or conducted any damage analyses. (Ex. B, at 37:10-18). Critically, Marsh does not even claim he has any expertise or experience using scientific or

academically-recognized methods to ascertain the impact of alleged "content scraping" – the essence of the *Daubert* standard.

In *Wallach v. Longevity Network*, No. 04-2404, 2006 WL 5106208 (C.D. Cal. Apr. 26, 2006), the court rejected an expert opinion proffered on the issue of likelihood of confusion based on inadequate qualifications. The purported expert in *Wallach* had many years of executive experience in the industry where the alleged infringement occurred, but no "experience in the field of trademark infringement, or more specifically, likelihood of confusion and damages." *Id.* at *2. The court found that, although the expert "likely received some exposure to trademarks as one facet of his business-related to [his] career, it was not the type of experience that now makes him a trademark expert." *Id.* at *4. Consequently, "[t]he simple fact that Mr. Blake has worked for large companies that own and use trademarks does not make him an expert in trademark infringement." *Id.* at *2.

Similarly, in *Brighton Collectibles v. Renaissance Group International*, No. 06-1115, 2008 WL 5500659 (S.D. Cal. May 13, 2008), a case involving claims of trade dress infringement, the court excluded the testimony of the plaintiff's marketing president who, like Marsh in this case, intended to opine on how the alleged infringement harmed the plaintiff. Even though she had substantial knowledge and expertise in the area of product branding, the court found the proffered expert's background did not apply to the key fact in dispute, and held "Plaintiff fails to establish that Ms. Young is qualified to testify as an expert regarding likelihood of confusion. Ms. Young may possess many years' experience as Brighton's president of marketing, but Plaintiff fails to establish that Ms. Young has 'knowledge, skill, experience, training, or education' sufficient to qualify her to offer expert testimony regarding consumer perception or the likelihood of confusion between Plaintiff's and Defendant's products." *Id.* at *3.

The rulings in *Wallach* and *Brighton Collectibles* demonstrate why Marsh does not meet Rule 702's qualification requirements in this case: Marsh has no specialized "knowledge, skill, experience, training, or education" that qualifies him as an expert regarding the impact of "content scraping."  It is not enough for him to have some limited experience designing "marketing strategies and promotional campaigns"—those issues are completely irrelevant to his proffered opinion regarding the impact of alleged content scraping.  Moreover, although Marsh has worked in marketing for the last ten years, Marsh admits he does not even know what "trade dress means" and that he has no economic or accounting background. (Ex. A, p. 15; Ex. B, 60:15-17).  He also admits he is not an expert in calculating damages and has never done so before. (Ex. B, at 44:14-17; 60:3-61:25).  As a result, he is unqualified to testify regarding the impact of the alleged intellectual property violations in this case.

## II. Marsh Does Not Use A Recognized Or Reliable Methodology To Arrive At His Conclusions.

Marsh's opinion also fails the second prong of Rule 702: his "methodology" is not really a methodology at all; his conclusory opinion is based exclusively upon assumptions that Zlien and its counsel provided to him.  Marsh repeatedly admitted in his deposition that he did not independently examine any of the critical facts underlying his conclusions and that the information available to him was "incomplete."  As such, Marsh's opinion is not amenable to any scientific testing and should be rejected.

The Supreme Court has offered a non-exhaustive list of *Daubert* factors that trial courts should consider in determining whether an expert's testimony is admissible under Rule 702: (1) whether the theory or technique the expert employs is generally accepted; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory can and has been tested; (4) whether the known or potential error rate is acceptable; and (5) whether there are

standards for controlling the technique's operation. *See Daubert*, 509 U.S. at 593. An expert's testimony must be reliable at "each and every step or else it is inadmissible." *Seaman v. Seacor Marine, LLC*, 326 Fed. App'x. 721, 725 (5th Cir. 2009). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Id.* (citations omitted). "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Id.* (citations omitted).

Here, Marsh did not employ any methodology at all, much less a reliable one. Marsh admitted his "content value" calculation was not a "generally accepted." (Ex. B, at 47:16-19). Because Marsh did not do any independent analysis, examination, or evaluation, it is impossible to demonstrate that his theories are actually generally accepted, subject to peer review, or capable of being tested, or that there are potential error rates or industry standards controlling his approach. *See Daubert*, 509 U.S. at 593. Indeed, Marsh admitted: "***I wasn't asked to do an analysis, I was asked to write an opinion***." (Ex. B, at 63:1-64:1) (emphasis added). As a result, his opinion is based exclusively upon "subjective belief" and "unsupported speculation." *Paz*, 555 F.3d at 388. *Daubert* is intended to exclude the very type of opinion Marsh offers: based purely upon his *ipse dixit*, *i.e.*, it is so because I say it is so. *See Hill ex rel. Hill v. Koppers, Inc.*, No. 03-60, 2009 WL 4908836, at *5 (N.D. Miss. Dec. 11, 2009). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Sergent v. Estate of Brackin*, No. 07-1112, 2009 WL 1809572, at *1 (S.D. Miss. June 24, 2009); *Fowler v. State Farm Fire & Cas. Co.*, No. 06-489, 2008 WL 2699777, at *2 (S.D. Miss. July 2, 2008) (excluding purported expert where Court was presented with the purported expert's *ipse dixit*, or unsupported assertions, and no reliable methodology). Moreover, the only "calculation" Marsh conducted—multiplying 4,128.44 hours with $150/hour to determine a "content value of

$619,266"—is not a reliable methodology. Indeed, Marsh acknowledged that he employed this calculation as a "different approach" because he "didn't really have very much information on how much content was taken[,] how many people had seen that content[,] [or] how much revenue was generated during that time the content was utilized." (Ex. B, at 46:17-47:4). Further, Marsh admitted Zlien's CEO devised the formula contained in his report, and that it was not a "generally accepted methodology." (Ex. B, at 47:16-48-3). Finally, he admitted the purported "content value" he devised included *all of the content on Zlien's* website – not just the one resource alleged to be infringing. (Ex. B, at 48:20-25). This admitted lack of methodology and analysis warrants exclusion of Marsh's testimony. *See Moore v. Ashland Chem. Inc.*, 151 F.2d 269, 279 (5th Cir. 1998) (excluding expert because his "theory had not been tested; the theory had not been subjected to peer review or publication; the potential rate of error had not been determined or applied; and the theory had not been generally accepted in the scientific community. In sum, Dr. Jenkins could cite no scientific support for his conclusion that exposure to any irritant at unknown levels triggers this asthmatic-type condition.").

What's more, the "facts" underpinning Marsh's opinion are similarly unreliable. It is settled that an opinion premised upon insufficient and erroneous information is not reliable. *Paz*, 555 F.3d at 389. Marsh conceded he "knew the amount of information [he] had available to [him] was incomplete." (Ex. B, 51:3-8). Further, the crux of Marsh's opinion—that Nationwide's alleged content scraping caused Zlien harm—is, in and of itself, an *assumption*. Marsh admitted he did not independently analyze (i) whether Nationwide actually took any of Zlien's content, or, more critically, (ii) whether the alleged "content scraping" was "actually harmful and how harmful it was," because he "had no way to do that." (Ex. B, 63:1-64:1). As a result, and because he "did not have a ton of specific evidence or facts that would suggest" the content scraping occurred, Marsh's opines only that, *if* the content scraping "did happen, this is

- 11 -

my opinion on why that *can be* harmful to Zlien[.]" (*Id.* (emphasis added)).  A careful review of the "Executive Summary" in Marsh's report also demonstrates its unreliability. He strategically chooses his words so as not to conclude affirmatively that Zlien *actually was* harmed by the alleged content scraping (because Marsh did not analyze or investigate whether in fact it was). Instead, Marsh states it "would have" harmed Zlien in certain ways if the alleged scraping had occurred; although in his deposition he back peddled, admitting his opinion is only that, "if this infringement happened, it *could be* harmful." (Ex. B, at 63:1-64:1) (emphasis added).  These bald, unsupported, untestable, and unverifiable opinions are a far cry from *Daubert*'s stringent requirements.

In *Seaman*, the trial court excluded the plaintiff's purported expert's opinion, which was similarly premised upon assumptions supplied by counsel. The expert in *Seaman* had concluded the plaintiff's occupational exposure to diesel exhaust had caused his bladder cancer, "bas[ing] her understanding of [the plaintiff's] regular exposure … on nothing more than the suggestion to her by Seaman's counsel that another Seacor employee said that [the plaintiff] had been exposed to the substances." *Id.* at 726.  The Fifth Circuit affirmed the district court's ruling that the proffered expert's "assumption of regular exposure without any 'facts upon which [the expert] could have possibly surmised exposure levels, rendered her causation opinion mere guesswork.'" *Id.* (citation omitted).  Further, the court concluded that, "[e]ven if reliance on counsel's suggestion were permitted, [the expert] still had no information about the amount of exposure to which [the plaintiff] was subjected … *viz.*, duration, concentration and other circumstances of the exposure." *Id.* at 728.

The same is true here: Marsh's opinion is based entirely upon assumptions provided by counsel, rendering his opinion "mere guesswork."  Indeed, Marsh readily conceded he did not independently analyze (i) the scope of the content alleged to have been "scraped" (Ex.

B, 68:1-10), (ii) who created the content at issue (Ex. B, 67:8-19), (iii) whether Nationwide actually took the content (Ex. B, 62:22-63:3), (iv) whether Zlien lost any market share (Ex. B, 65:20-24), (v) whether Nationwide acquired any customers from any of the content allegedly scraped (Ex. B, 68:17-21), or (vi) whether "Nationwide diverted brand recognition from Zlien." (Ex. B, 15-19).  Marsh's lack of investigation and reliance upon assumptions Zlien and its counsel provide render it impossible to test Marsh's conclusions. Therefore, his opinion is inadmissible. *See Guy v. Crown Equip. Corp.*, 394 F.3d 320 (5th Cir. 2004) (holding testimony of a proffered engineering expert in a forklift design case was properly excluded where his opinions were untested, unreliable, and based on unreliable suggestions rather than specifically formulated opinions).

### III.  Marsh's Opinion Is Unhelpful To The Trier Of Fact.

The Court should exclude Marsh's opinions for a third, independent reason: his testimony is neither relevant nor helpful to the trier of fact.  An expert may testify only if his "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]"  Fed. R. Evid. 702.  Here, Marsh admitted he is not a damages expert, and conceded he is not an expert in intellectual property infringement. Therefore his opinion is not relevant to any issues in the case and would be useless to the trier of fact.

In his deposition, Marsh confessed he is not an expert in calculating damages:

Q: … Do you consider yourself to be an expert in calculating damages for trade  dress or copyright infringement?

A: I'm not sure.

…

Q: So you're not an expert [in] calculating damages?

A:  That's probably not my strongest suit, no.

(Ex. B, at 61:2-25). Marsh also admitted he cannot opine on any intellectual property violation issues:

> Q: Now, you were not retained to offer an opinion about whether a copyright or trade dress was infringed, were you?
>
> A: I don't believe so.
>
> Q: You're not offering an opinion on that subject?
>
> A: No.
>
> Q: And you haven't analyzed whether or not there was any copyright or trade dress infringement here?
>
> A: No.
>
> Q: And you have no basis for saying there was or there wasn't?
>
> A: No. I would look for that information to be provided to me.
>
> Q: And that wasn't provided to you? That's not party – I'm just trying to define the scope of your opinion?
>
> A: Well, I don't believe I'm someone that could make that analysis. I'm not even sure what trade dress means.

(Ex. B, at 53:3-23). As a result of Marsh's own professed lack of expertise in damages and intellectual property violations, there is nothing left for him to testify about, and he cannot assist the trier of fact.

Marsh's admitted limitations are no different than the proffered expert Judge Africk excluded in *Shawler v. Ergon Asphalt & Emissions*, No. 15-2599 (E.D. La. Mar. 15, 2016). In *Shawler*, Judge Africk found that, even if the plaintiff's testimony survived Rule 702—which it did not—the opinion is "subject to further review under Rule 403." *See id.* at *12. Judge Africk concluded the proposed expert's testimony was completely unhelpful because the expert's report was "replete with the opinions of a 'hired gun,' *i.e.*, someone more interested in results than in methodology." *Id.* at 11. The expert's report contained legal conclusions, for

example, regarding the unseaworthiness of the vessel at issue, but the plaintiff did not make any claim of seaworthiness: "Accordingly, Caskey's opinion on this issue is excluded not only because it is an improper legal conclusion but also because it is not relevant to Shawler's claims. The fact that Caskey would even render an opinion as to the unseaworthiness of the vessel, seaworthiness of the vessel not being an issue in the case, goes to the cookie cutter approach which permeates his opinions." *Id.* at *12 n.42.

Marsh's proposed opinion is no different than the proffered expert in *Shawler*; Marsh is not an expert in damages nor intellectual property issues, yet he opines on "content value." Neither Marsh nor Zlien can show how "content value" is at all relevant to this case; "content value" is not a measure of damages in intellectual property disputes. Further, Marsh did nothing to examine, evaluate, or analyze the 4,128.44 hour figure provided to him from Zlien's CEO, and his computation of "value" merely multiplied that number by $150/hour. Expert testimony is not necessary to do simple multiplication—especially where the proffered expert does not have any economic, financial, or accounting background. The issues in this case concern Nationwide's alleged violations of Zlien's intellectual property rights purportedly over one narrow Resources Chart, and any resulting damages. Marsh conceded, however, that he could not opine on any intellectual property violation issues, and that he is not a damages expert on such violations. As a result, nothing in Marsh's report or testimony will assist the trier of fact.

## CONCLUSION

The Court should preclude Zlien's proffered expert, Jason Marsh, from testifying at trial. Marsh lacks the background, education, and experience to qualify as an expert witness on intellectual property violations, or on damages. Further, his opinion is based on pure speculation and his opinion was not derived from any methodology whatsoever. Marsh's own

admissions regarding the scope of his testimony reveal that his opinions are irrelevant and would be unhelpful to the trier of fact.    The Court should grant Nationwide's motion and preclude Jason Marsh from testifying as an expert witness at trial.

                          Respectfully submitted,

                          */s/ Jamie  L. Berger*
                          Jamie L. Berger (LA Bar No. 32340)
                          Michael A. Balascio (LA Bar No. 33715)
                          Laurence D. LeSueur (LA Bar No. 35206)
                          **BARRASSO USDIN KUPPERMAN**
                            **FREEMAN & SARVER, LLC**
                          909 Poydras Street, 24th Floor
                          New Orleans, Louisiana 70112
                          jberger@barrassousdin.com
                          mbalascio@barrassousdin.com
                          llesueur@barrassousdin.com
                          Tel:  (504) 589-9700
                          Fax: (504) 589-9701

                          *Attorneys for Defendant*
                          *Nationwide Notice, Inc.*

## **CERTIFICATE OF SERVICE**

       I hereby certify that a copy of the above and foregoing has been filed using this

Court's ECF procedure, which will send electronic noticing to all counsel of record this 17th day of January, 2018.

*/s/ Jamie  L. Berger*